FILED

2024 Jun-12  AM 10:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LAKINA HILL WILKINS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:21-cv-01637-RDP** |
| | } | |
| **ENGINEERED PLASTIC** | } | |
| **COMPONENTS, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant Engineered Plastic Components Inc.'s ("EPC" or "Defendant") Motion for Summary Judgment. (Doc. # 33). Plaintiff Lakina Hill Wilkins has responded to the Motion. (Doc. # 43). Defendant did not file a reply brief. For the reasons discussed below, the Motion is due to be granted.

## I.    Relevant Undisputed Facts[1]

Defendant produces plastic products for car manufacturers and has a location in Bessemer, Alabama where Plaintiff worked. (Doc. # 34-3 at 44).[2]

As discussed below, Plaintiff previously worked for Defendant's predecessors. Before that, she had experience in jobs ranging from restaurant manager to medical billing clerk. (Doc. # 34-1 at 80; Doc. # 34-2 at 47-48). Plaintiff has a two-year associate degree in office management and medical records from Shelton State Community College. (Doc. # 34-1 at 61-63). She attended

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] The court generally cites to the CM/ECF page number, except in the case of depositions, where it cites to the deposition transcript page number.

Shelton State from 2010 until 2012. (Doc. # 34-1 at 62). Prior to that, she had drawn disability for a number of years, and "once I was ready to go back to the workforce, I went back to school." (*Id.*).

Plaintiff worked at the Bessemer facility under Defendant's predecessor companies beginning in 2013 and in various roles. (Doc. # 34-1 at 63-66, 80, 90-91; Doc. # 34-2 at 47-48). She was not a qualified engineer. (Doc. # 34-1 at 80; Doc. # 34-2 at 47-48).

In September 2020, when Defendant EPC purchased the company, Plaintiff was employed by INOAC. (Doc. # 34-3 at 11, 13). At that time, INOAC was losing millions of dollars per year. (Doc. # 34-3 at 11, 13). At the time of the acquisition, Defendant initially retained INOAC's personnel and structure. (Doc. # 34-1 at 116-17; Doc. # 34-2 at 60; Doc. # 34-4 at 36). Defendant brought in Steve Martin (Caucasian male) as Operations Manager to facilitate changes and "turn a losing company profitable." (Doc. # 34-3 at 11, 13).

Plaintiff was in the position of Production Supervisor at the time Defendant acquired the facility from INOAC and her pay was $63,000 annually, plus overtime. (Doc. # 34-1 at 93-96, 111). There were several other Production Supervisors, including Tamekia Bray (African American female) and Kareem Jones (African American male). (Doc. # 34-1 at 30, pp. 113-14). Johnathon Nix (African American male) later moved into a Production Supervisor role. (Doc. # 34-1 at 128-29). Plaintiff and Bray were the only people employed by Defendant at any of its locations who received overtime pay. (Doc. # 34-3 at 54, 75).

In early 2021, Plaintiff along with Tamekia Bray and Johnathan Nix requested a pay raise. (Docs. # 34-1 at 125-27; # 34-2 at 30; # 41-1 ¶ 13). Plaintiff felt she did more than her fellow production supervisors and therefore deserved a raise. (Doc. # 34-1 at 127-29). Plaintiff admitted

that a 3/5 or "meets expectations" was an appropriate evaluation of her performance at that time. (Doc. # 34-1 at 145). When Nix moved into the Production Supervisor role, he was evaluated after ninety (90) days and received a raise at that time. (Doc. # 34-3 at 66-67). At the time of her annual review, Bray also "got a substantial pay increase because of her great job." (Doc. # 34-3 at 66).

In March and April 2021, Defendant received written complaints about Plaintiff from two employees. (Doc. # 34-1 at 133-40, Doc. # 34-2 at 31-35). Martin testified that on multiple occasions he intended to write Plaintiff up, but the Plant Manager, Greg Montgomery, stopped him. (Doc. # 34-3 at 12). Tammy Lauderdale, Defendant's Human Resources Supervisor, also testified that Mr. Montgomery stopped her from writing up Plaintiff. (Doc. # 34-4 at 8, 107).

In March 2021, Plaintiff's co-worker Ray Davis texted her while she "was out with [her] dental work." (Doc. # 34-1 at 198). Davis's text stated: "Steve, Greg, and Priscilla, it ain't no way Kina having all these migraines. We have to come up with a solution for this FMLA shit." (*Id.* at 199; Doc. # 41-1 at 21). The message also contained five laughing emojis. (*Id.*). Plaintiff explained that the text indicated that Davis overheard Montgomery, Hansen, and Wilson talking about her use of FMLA leave. (Doc. # 34-1 at 199).

In April 2021, Martin responded to Plaintiff's February request for a pay increase by telling Plaintiff "[W]e [can] talk about this in the near future." (Doc. # 34-1 at 126-27).

Martin testified that he told Plaintiff that she was being moved from the Production Department to the Quality Department, and that Montgomery would discuss the details with her. (Doc. # 34-3 at 54-56). Martin was instructed by Montgomery that he (Montgomery) would handle the details with Plaintiff. (*Id.*).

In May 2021, Montgomery asked Plaintiff how she felt about transferring to the Quality Department. (Doc. # 34-1 at 119; Doc. # 35-1 at 2). That was the job Defendant had available for Plaintiff. (Docs. # 35-1 at 2; # 34-3 at 54-56). Montgomery tried to explain to Plaintiff that she could increase her earnings with the move to the Quality Department. (Docs. # 35-1 at 2; # 34-3 at 54-56). Nevertheless, Plaintiff refused the position. (Doc. # 34-1 at 119; Doc. # 35-1 at 20).

In June 2021, despite her earlier refusal to voluntarily take the position, Plaintiff was transferred to the Quality Department as a Quality Engineer at a salary of $63,742, with the opportunity for a salary increase based on a performance evaluation in ninety (90) days. (Doc. # 34-1 at 122; Doc. # 34-2 at 29; Doc. # 34-4 at 53-57; Doc. # 34-4 at 87).

Plaintiff complains that she was not paid the same amount as Quality Engineers Rene Zimmerman and Adam Hansen. (Doc. # 34-2 at 41-46; Doc. # 35-1). Zimmerman and Hansen were both white male Quality Engineers who held engineering degrees and had more extensive experience and training. (Doc. # 34-2 at 41-46; Doc. # 35-1).

Zimmerman holds a Mechanical Engineering Degree from UAB, began his relevant work in Berlin in 2000, and was a Supplier Quality Engineer for Mercedes for two years and served as a Senior Quality Engineer for multiple companies. (Doc. # 34-2 at 41-44; Doc.# 35-1 at ¶ 12). In June 2021, Plaintiff worked with Zimmerman after she was transferred to the Quality Department. (Doc. # 34-1 at 169-70). Plaintiff was "moved back to quality to help with the paper side of life, the HTRs, things like that." (Doc. # 34-3 at 59).

Hansen received a bachelor's degree in Materials Science and Engineering from UAB, and had been a Quality Engineer for Grede Holdings and AGC Automotive, and a Program Quality Leader at Faurecia Interior Systems, Inc. for several years. (Doc # 34-2 at 25; Doc. # 35-1 at ¶ 12).

Hansen "was a much more seasoned advanced engineer []." (Doc. # 34-3 at 58). Plaintiff admitted she never worked with Hansen, and that he was quickly elevated to Quality Manager and became her supervisor. (Doc. # 34-1 at 170).

Plaintiff admits she did not know Zimmerman's and Hansen's salaries, but speculated they made more than her because the position "topped out" at $85,000. (Doc. # 34-1 at 153-60, 210). Plaintiff testified that she told Montgomery, "[i]n order for me to stay in this position, you must [sic] going to get my money right." (Doc. # 34-1 at 171-72).

After Plaintiff's transfer, Rhonda Hendrix, a Caucasian female, assumed Plaintiff's Production Supervisor position on a temporary basis. (Doc. # 34-1 at 147, 150). Although all Production Supervisors were subject to the same job description, they did not necessarily perform the same duties that Plaintiff performed when she held that position. (Doc. # 34-4 at 108-09; Doc. # 34-3 at 24-25). Steve Martin had worked with Hendrix previously. (Doc. # 34-3 at 59-61). He hired Hendrix for her ability to train and grow a team. (*Id*.). Hendrix previously worked as a superintendent and left that job to take a "higher" position with Defendant. (*Id*.).

Montgomery, who was the Plant Manager for Defendant and its predecessor INOAC, testified by Declaration that Defendant "made pay decisions based on employees' experience, training, and abilities." (Doc. # 35-1 at ¶ 12). He also noted that the "male comparators [Plaintiff] pointed to in this lawsuit – Rene Zimmerman and Adam Hansen [] – had greater experience, training, and abilities than Plaintiff, and each performed different jobs than Plaintiff." (*Id*. at ¶ 13).

After Plaintiff was moved to the Quality Department, she was not performing in a Quality Engineer role. (Doc. # 34-3 at 76-77). Rather, she was doing paperwork to help get ready for an audit. (Doc. # 34-3 at 76-77). She also made visual boards and walked the floor to provide

5

assistance. (Doc. # 34-1 at 166-69). In fact, the entire facility was involved in preparing for the AITF audit. (Doc. # 34-3 at 36-37).

Between June and August 2021, Plaintiff asked Montgomery when he was "going to get [her] money right?" (Doc. # 34-1 at 172-73).

Because Defendant had purchased INOAC in September 2020, in August 2021, Plaintiff had been employed by Defendant for less than twelve months (one year). (Doc. # 34-1 at 116-17). Nonetheless, Plaintiff was allowed to take intermittent FMLA leave days. (Doc. # 34-1 at 189-96). For example, on August 9, 2021, Plaintiff asked Hansen, the Quality Department Manager, to take time off for a medical procedure. (Doc. # 34-1 at 176). Two days later, on August 11, 2021, Hansen responded by telling Plaintiff "I don't know if I'm going to be able to let you get off because I don't have coverage." (Doc. # 34-1 at 174). To that message, Plaintiff responded:

> "Well, Adam, FMLA you have no control over, and if I have a doctor's appointment or a procedure scheduled, you know, that's just scheduled." I said, "Now, what I would do for you" -- because one of the techs was out -- "I'll call and see if I can move it, if he could move it back a few days or whatever."
>
> I called, I reached out to them, and they couldn't move my procedure – my procedure. So -- excuse me. So I guess he didn't know the ramifications of FMLA, so he went and asked Priscilla. And that's when Priscilla and Adam called me in the office[].

(Doc. # 34-1 at 174-75).

As it turned out, August 11, 2021 was Plaintiff's last day of employment with EPC. (Doc. # 34-1 at 50-51, pp. 193-94). Plaintiff was called into a meeting that day (which she recorded) with Hansen, Montgomery, and Priscila Wilson. (Doc. # 34-1 at 221). Plaintiff was shown a document that listed all of the workdays Plaintiff had missed to that point in 2021. (Doc. # 41-1 at ¶ 14, 27). Plaintiff was presented with a written warning for "missing work excessively," requiring others

"to cover her workload which negatively affect[s] their job performance." (Doc. # 34-2 at 60). The document also stated: "Lakina needs to report to work as scheduled except for planned vacation or absences excused by FMLA. Currently, Lakina has no more unpaid days off." (Doc. # 34-2 at 60). The document also stated, "She needs to move into quality office by 8/13/21." (Doc. # 34-2 at 60). As Plaintiff points out, before August 11, 2021, there was no documentation about issues with Plaintiff's performance. (Doc. # 34-4 at 51-52).

Much of the August 11 meeting centered on attempting to discern which of Plaintiff's absences were submitted as FMLA absences. (Doc. # 34-2 at 61; Doc. # 34-1 at 222-269). There was discussion that, based on her FMLA paperwork, it was anticipated Plaintiff would be out three or four times a month. (Doc. # 34-1 at 228-29). However, because Plaintiff was actually out eight days a month, Wilson told her the only job they had for her was in the Quality Department. (Doc. # 34-1 at 228-29).[3] Plaintiff has operated her own catering business since 2017. (Doc. # 34-1 at 52, 58-59). Perhaps coincidentally, around this period of time, Plaintiff had decided to transform her catering business to a "brick and mortar" building. (*Id.* at 52-53). In April 2021, Plaintiff secured a building for her catering business and began purchasing equipment for the new business. (*Id.*).

Hansen clarified with Plaintiff that they were meeting not about FMLA, but about attendance overall. (Doc. # 34-1 at 232). During the meeting, Wilson asked Plaintiff if she wanted the Quality Department job. She said no. (Doc. # 34-1 at 229). Plaintiff herself testified that she made it clear that she was refusing to take the Quality Department job. (Doc. # 34-1 at 230, 271).

---

[3] During this portion of Plaintiff's deposition, the tape recording of the meeting was being played on the record.

Wilson later called Plaintiff and told her that if she refused the Quality Department job she would be terminated. (Doc. # 34-1 at 278). Plaintiff again refused the position, and her employment was terminated for insubordination. (Doc. # 34-4 at 75-119; Doc. # 34-2 at 64; Doc. # 34-1 at 231-32:7; Doc. # 35-5 at ¶¶ 7-11, 14). Montgomery stated in his declaration that Plaintiff's refusal of the Quality Department position was "unwarranted" and, "[a]s a result, I participated in, and approved of, the decision to terminate [] Plaintiff's employment." (Doc. # 35-5 at ¶¶ 7-11, 14).

Plaintiff's employment was terminated effective August 12, 2021. (Doc. # 34-4 at 82). On August 12, 2021, Plaintiff called the police and had a police officer escort her to Defendant's facility to retrieve some of her things. (Doc. # 34-1 at 216).

Plaintiff communicated with an EEOC investigator on October 13, 2021. (Doc. # 41-1 at 32-38). On October 15, 2021, Plaintiff signed her initial EEOC charge against Defendant asserting that she was discriminated against on the basis of her race and sex. (Doc. # 1-1 at 2). She lists the dates of discrimination only as August 13, 2021. (*Id.*). That charge said nothing about pay discrimination or retaliation. (*Id.*).

On October 19, 2021, the EEOC investigator recommended dismissal and closure of Plaintiff's EEOC charge because "the investigation does not support the allegations of discrimination." (Doc. # 41-1 at 29). The investigator reported that he informed Plaintiff "of the criteria necessary to further a charge of discrimination based on statutes that the EEOC enforces" and "that her charge did not meet that criteria." (*Id.*). The EEOC mailed Plaintiff her Notice of Right to Sue on October 19, 2021. (Doc. # 34-2).

On November 16, 2021, Plaintiff filed another EEOC charge against Defendant regarding her pay and asserting that Defendant retaliated against her for complaining about pay disparities

by terminating her employment. (Doc.# 1-1 at 6). Plaintiff listed the date of discrimination as August 12, 2021. (*Id*.). Plaintiff has not included in the Rule 56 record any dismissal and notice of rights to sue as to this charge.

## II.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Civ. P. 56(c). The moving party must show the court that there is a basis for granting summary judgment, as well as point to the evidence contained in the pleadings that demonstrates an absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. When the movant has met its burden, Rule 56 requires the non-moving party to highlight specific facts beyond the pleadings (such as affidavits, depositions, interrogatory answers, or admissions on file) that show a genuine issue for trial. *See Id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (citing U.*S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir.1991) (*en banc*). If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party

makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

In making a determination as to which facts are material, a court is guided by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Any reasonable doubts about the facts, or any justifiable inferences derived therefrom, are resolved in favor of the non-moving party. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007). A dispute exists when "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Anderson*, 477 U.S. at 248.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Thus, a court's inquiry in a Rule 56 motion is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Analysis

Plaintiff's Complaint asserts seven counts against Defendant. These are categorized as follows:

1. Count I—Title VII (Race Discrimination);
2. Count II—Title VII (Sex Discrimination);
3. Count III—Title VII (Retaliation);
4. Count IV—42 U.S.C. § 1981 (Race Discrimination);
5. Count V—42 U.S.C. § 1981 (Retaliation);
6. Count VI—Equal Pay Act (Sex Discrimination); and

10

    7.  Count VII— Family and Medical Leave Act (Retaliation).

(Doc. # 1). The court addresses each of her claims below.

### A.    Plaintiff's Pay Claims in Counts I, II, and IV

Counts I and IV of Plaintiff's Complaint assert claims of race discrimination under Title VII and Section 1981, and Count II asserts a claim of sex discrimination under Title VII. (Doc. # 1 at ¶¶ 34-39, 40-44, 51-56). All three of these claims complain about wage discrimination. (*See* Doc. # 43 at 22-30). Generally, claims brought pursuant to Title VII and Section 1981 are analyzed under the same analytical framework. *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

In asserting her claims, Plaintiff compares herself to a white employee, Rhonda Hendrix, and also mentions "two white men were paid over 30% more" than she was. (Doc. # 1 at ¶¶ 35-37). Plaintiff's response to Defendant's Motion confirms she is referring to two Quality Engineers: Rene Zimmerman and Adam Hansen. (Doc. # 43 at 24).

To state a prima facie case of wage discrimination under Title VII, Plaintiff may show that (1) she belongs to a protected class, (2) she received low wages, (3) similarly situated comparators outside the protected class received higher compensation, and (4) she was qualified to receive a higher wage. *Walker v. Fulton Cty. Sch. Dist.*, 624 F. App'x 683, 686 (11th Cir. 2015). At issue here is whether Plaintiff is similarly situated to Hendrix, Zimmerman and Hansen.

To establish a prima facie case of wage discrimination, Plaintiff may show that she, Hendrix, Zimmerman and Hansen are "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of

discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d at 1224-25. Regarding comparators, "a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Lewis*, 918 F.3d at 1228. That is, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* (quoting *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015)). The *Lewis* decision also makes clear that "that a meaningful comparator analysis must remain part of the prima facie case." *Id.* at 1221-24.

"If the plaintiff makes this [initial] showing, [s]he raises a presumption that h[er] race [or gender] motivated h[er] employer to treat h[er] unfavorably." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325-26 (11th Cir. 2011). Thereafter, "the burden then shifts to the employer to rebut this presumption by producing evidence that [the employer's] action was taken for some legitimate, non-discriminatory reason." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). "If the employer meets its burden of production, the presumption of discrimination raised by the plaintiff's prima facie case is rebutted and thus disappears." *Smith*, 644 F.3d at 1325-26. Finally, if the presumption is rebutted, "the inquiry proceeds to a new level of specificity, whereby the plaintiff must show the employer's proffered reason to be a pretext for unlawful discrimination." *Id.* (quotations omitted).

The Eleventh Circuit has noted that "'establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.' Even without similarly situated comparators, 'the plaintiff will always survive summary judgment if he … presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Lewis v.*

*City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (quoting *Smith*, 644 F.3d at 1328). With this legal framework in mind, the court turns to assessing Plaintiff's pay claims.

Plaintiff has an associate degree in office management and medical records from Shelton State Community College. (Doc. # 34-1 at 61-63). Prior to working for Defendant's predecessors, Plaintiff had experience in jobs ranging from restaurant manager to medical billing clerk. (Doc. # 34-1 at 80; Doc. # 34-2 at 47-48). Plaintiff had worked in various roles at the Bessemer facility for predecessor companies since 2013. (Doc. # 34-1 at 63-66, 80, 90-91; Doc. # 34-2 at 47-48). Defendant retained Plaintiff after it purchased INOAC, which had been losing millions of dollars per year. (*Id.*). Plaintiff was not a qualified engineer. (Doc. # 34-1 at 80; Doc. # 34-2 at 47-48).

Zimmerman holds a Mechanical Engineering Degree from UAB, began his relevant work in Berlin in 2000, and was a Supplier Quality Engineer for Mercedes for two years and a Senior Quality Engineer for multiple companies. (Doc. # 34-2 at 41-44; Doc.# 35-1 at ¶ 12). Zimmerman performed "data control, park data, PPAP submission, regulatory -- safety and regulatory requirements, pull force testing, things like that[.]" (Doc. # 34-3 at 59, 64).

Hansen received a bachelor's degree in Materials Science and Engineering from UAB, and he had been a Quality Engineer for Grede Holdings and AGC Automotive, and the Program Quality Leader at Faurecia Interior Systems, Inc. for several years. (Doc # 34-2 at 25; Doc. # 35-1 at ¶ 12). Hansen "was a much more seasoned advanced engineer that could do SPC data, could do problem solving, could chart pin dots for issues[.]" (Doc. # 34-3 at 58). After he was hired, Hansen was quickly elevated to Quality Manager and became her supervisor. (Doc. # 34-1 at 170).

Martin, who was brought in to make the Bessemer facility profitable, had worked with Hendrix previously. (Doc. # 34-3 at 59-61). Martin hired Hendrix because of her ability to train and grow a team. (*Id*.). Hendrix had been a superintendent previously and left a higher level position to work for Defendant. (*Id*.).

The undisputed facts in the Rule 56 record simply do not support any conclusion (or even suggestion) that Plaintiff, Hendrix, Zimmerman, and Hansen are "sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Lewis*, 918 F.3d at 1228 (quoting *Young v. United Parcel Serv., Inc*., 135 S. Ct. 1338, 1355 (2015)). On the one hand, Plaintiff had an associate degree from a community college in subjects not directly relevant to manufacturing. She had been hired as a temporary employee in 2012 and worked her way up within Defendant's predecessor companies.

On the other hand, Zimmerman and Hansen both had engineering degrees from a reputable four-year university and, after their respective graduations, they gained much more extensive, relevant, and advanced work experience. Plaintiff admits Hansen was her supervisor. Hendrix had previously been a superintendent and was hired because Martin had a prior working relationship with her. Hendrix actually took a step down in accepting the job with Defendant. Her work experience and management background far surpass that of Plaintiff.

Under these facts, Plaintiff has failed to satisfy the *McDonnell-Douglas* framework because she has not identified a proper comparator. But, the court's analysis does not end there because *McDonnell-Douglas* is not the sole method for a plaintiff to establish a triable issue of fact regarding her discrimination claim. A plaintiff may alternatively present the sort of circumstantial evidence that otherwise creates a triable issue concerning the employer's discriminatory intent

14

*Lewis II*, 934 F.3d at 1185. But here, Plaintiff has not done that either. The disparity in the qualifications between Plaintiff and the alleged comparators is stark. Further, Plaintiff has not presented sufficient facts to create a genuine issue of fact as to whether the proffered reasons the comparators were paid more than her were the real reasons for the pay differential.

The evidence also fails to support any inference that Defendant treated black employees less favorably. Plaintiff and Tamekia Bray, another black female employee, were the only people employed by Defendant at any of its locations who received overtime pay. (Doc. # 34-3 at 54, 75). Although Plaintiff argues that white employees received raises when black employees did not, the evidence shows that Bray and Johnathan Nix (a black male) requested a pay raise around the same time as Plaintiff. (Docs. # 34-1 at 125-27; # 34-2 at 30; # 41-1 ¶ 13). Martin told Plaintiff "we [can] talk about this in the near future." (Doc. # 34-1 at 126-27). In contrast, when Nix moved into the Production Supervisor role, he was evaluated after ninety (90) days and received a raise. (Doc. # 34-3 at 66-67). And, Bray "got a substantial pay increase because of her great job" at her annual review. (Doc. # 34-3 at 66).

Plaintiff has presented no other circumstantial evidence that Defendant had any discriminatory intent. Because Plaintiff has not presented evidence sufficient to create a genuine issue of material fact as to whether Defendant engaged in pay discrimination against her because of either her race or sex, Defendant is entitled to summary judgment on Plaintiff's wage discrimination claims in Counts I, II, and IV.

### B.    Plaintiff's Retaliation Claims in Counts III and V

Counts III and V of Plaintiff's Complaint assert claims of retaliation under Title VII and Section 1981. (Doc. # 1 at ¶¶ 45-50, 57-62). There are some differences in how those two statues

address retaliation. But, because retaliation claims under Title VII and Section 1981 are generally evaluated under the same framework, the court discusses these claims together, *see Goldsmith v. Bagby Elevator Co*., 513 F.3d 1261, 1277 (11th Cir. 2008) (explaining that the same elements apply to retaliation claims under Title VII and § 1981), and notes any differences in the analyses, as appropriate.

### 1.    Failure to Exhaust Administrative Remedies

As to Count III, Plaintiff's retaliation claim under Title VII,[4] Defendant argues that Plaintiff failed to exhaust her administrative remedies on her retaliation claim by failing to check the retaliation box when she filed her first EEOC Charge. (Doc. # 36 at 21). She alleged retaliation in her second charge, but the record does not contain evidence that a dismissal and notice of rights was ever issued on that charge. Plaintiff responds that in addition to the specific allegations contained in the original charge of discrimination, a judicial complaint may also be based upon the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination. (Doc. #43 at 22).

A "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Hum. Res*., 355 F.3d 1277, 1280 (11th Cir. 2004) (quoting *Alexander v. Fulton Cnty*., 207 F.3d 1303, 1332 (11th Cir. 2000)). "[J]udicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but ... allegations of new acts of discrimination are inappropriate." *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) (quoting *Gregory*, 355 F.3d at 1279-80).

---

[4] This argument is inapplicable to Plaintiff's Section 1981 retaliation claim in Count Five.

In her initial EEOC Charge, Plaintiff did not check the retaliation box, but she described the circumstances leading to the termination of her employment. (Doc. # 1-1 at 2-3). So, the question before the court is whether Plaintiff's retaliation claim could "reasonably be expected to grow out of" the allegations of discrimination made in the initial EEOC Charge. Although it appears that the EEOC did not do much of an investigation of Plaintiff's charge (Doc. # 34-2 at 62), the EEOC *should* reasonably have been expected to investigate the reasons Defendant terminated Plaintiff's employment.  It is likely that a reasonable investigation would (or should) have included a review of (and uncovered facts related to) alleged retaliation. Because the factual allegations of the initial charge indicate that a lateral move was discussed, the court is giving Plaintiff the benefit of the doubt here: Plaintiff, in her papers, said that her discharge was unfair, and shortly thereafter her employment was terminated. (Doc. # 1-1; Doc. # 34-2 at 62).

There is good reason to give Plaintiff this benefit. "Courts are [] 'extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII].'" *Gregory*, 355 F.3d at 1280 (quoting *Sanchez v. Standard Brands, Inc*., 431 F.2d 455, 460-61 (5th Cir.1970)). And as the Eleventh Circuit has noted, "'the scope of an EEOC complaint should not be strictly interpreted.'" *Id*. (quoting *Sanchez*, 431 F.2d at 465). Viewing the Rule 56 record in the light most favorable to Plaintiff, the court concludes that Plaintiff's retaliation claim could "reasonably be expected to grow out of" her initial EEOC charge's allegations. Therefore, the court concludes, at least for purposes of this motion, that Plaintiff exhausted her administrative remedies with respect to her Title VII retaliation claim. *See Gregory*, 355 F.3d at 1279-80. The court notes that Plaintiff's retaliation claim under Section 1981 may proceed in any event, because Title VII exhaustion does not apply to such a claim. Having said that, "[i]t also goes without saying that the courts can and

should preclude double recovery by an individual." *Gen. Tel. Co. of the Nw. v. E.E.O.C.*, 446 U.S. 318, 333 (1980) (citing *Alexander v. Gardner-Denver Co*., 415 U.S. 36, 51, n.14 (1974)). A § 1981 retaliation claim only is available when a plaintiff claims retaliation for opposing race discrimination. Section 1981 cannot be used to pursue a claim that a plaintiff was retaliated against for complaining about sex discrimination. *Bonham v. Wal-Mart, Inc.*, No. 2:18-cv-01201-AKK, 2018 WL 4912633, at *2 (N.D. Ala. Oct. 10, 2018) (citing *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960-61 (11th Cir. 1997)).

### 2.    Plaintiff's Prima Facie Case

Under the modified *McDonell Douglas* framework, to succeed on a retaliation claim, Plaintiff "must first make out a prima facie case of retaliation, showing (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Patterson v. Ga. Pacific, LLC*, 38 F.4th 1336, 1344-45 (11th Cir 2022) (citing *Gogel v. Kia Motors Mfg. of Ga., Inc*., 967 F.3d 1121, 1134 (11th Cir. 2020)). If the plaintiff can make that showing, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason or reasons for the [alleged] retaliation." *Patterson*, 38 F.4th at 1345. "If the employer does, the plaintiff must show that each reason is merely a pretext and that the real reason was retaliation." *Id*.

"An employee's complaint about discrimination constitutes protected activity if the employee could 'reasonably form a good faith belief that the alleged discrimination existed.'" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (quoting *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999)). A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa*

18

*Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Monaghan v. Worldpay US, Inc*., 955 F.3d 855, 861 (11th Cir. 2020). As the Supreme Court recently explained, a plaintiff "need show only some injury respecting her employment terms or conditions. [A] transfer must have left [the plaintiff] worse off, but need not have left her significantly so." *Muldrow v. City of St. Louis, Missouri*, 144 S. Ct. 967, 977 (2024)

Usually, the key summary judgment question a court faces in assessing a retaliation claim under Rule 56 is whether there was a causal relation between protected activity and an adverse action. The Eleventh Circuit recently examined Supreme Court precedent and explained Plaintiff's burden this way: "In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court held that a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Knox v. Roper Pump Co*., 957 F.3d 1237, 1245 (11th Cir. 2020) (citing *Nassar*, 570 U.S. 338, 362 (2013)) (internal quotes omitted).

However, "the *McDonnell Douglas* framework is not the only way to prove retaliation." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023). A plaintiff may also use circumstantial evidence to prove retaliation "so long as the evidence raises a reasonable inference of retaliatory intent." *Id.* The Eleventh Circuit has identified three, non-exclusive categories of circumstantial evidence that can raise a reasonable inference: "[1] evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; [2] evidence of systemically better treatment of similarly situated employees; or [3] evidence that the employer's justification for its action is pretextual." *Id.* at 1311.

### a.      Protected Conduct

Defendant argues that Plaintiff did not engage in protected conduct because she merely sought to be paid for what she claimed to be worth and did not have a good faith belief that any pay disparities were discriminatory. (Doc. # 36 at 21). In particular, Defendant points out that she had no idea what her comparators actually earned. Plaintiff responds that she "expressed her opposition to" transferring to the Quality Department "without an increase in pay [and] specifically pointed out that the white male employees who were currently occupying (or who recently occupied) the position made more money than her." (Doc. # 43 at 30). Although the court has doubts about the reasonableness of Plaintiff's belief that she should have been paid the same as Zimmerman, Hansen, and Hendrix, viewing the record in the light most favorable to Plaintiff, that arguably may be an issue for a trier of fact to determine. Thus, for purposes of this motion only, the court assumes there is at least a question of fact regarding whether Plaintiff engaged in protected conduct.

### b.      Adverse Action

Plaintiff asserts that she suffered two adverse actions: being transferred to the Quality Department without a pay increase on June 14, 2021, and having her employment terminated on August 11, 2021. (Doc. # 43).

Plaintiff was transferred to the Quality Department despite saying she did not want the position without a pay raise. The new job was not one she necessarily wanted. So, at least arguably, under new Supreme Court precedent, it would be for a jury to decide whether that transfer constituted an "injury respecting her employment terms or conditions" regardless of whether it left her significantly less well off. *Muldrow*, 144 S. Ct. at 977. Certainly, an unwanted transfer is

20

something that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 67. Termination of one's employment is clearly an actionable adverse action. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). Thus, Plaintiff has established the second element of her prima facie case of retaliation.

### c.     Causal Link

To establish this final element of her prima facie case, Plaintiff must establish that her protected activity was a but-for cause of the adverse action by the employer. *Knox*, 957 F.3d at 1245; *Nassar*, 570 U.S. at 362. Plaintiff asserts that "'temporal proximity' alone is sufficient to establish causation when that proximity is 'very close.'" (Doc. # 43 at 32 (citing *Brown v. Alabama Department of Transportation*, 597 F.3d 1160, 1182 (11th Cir. 2010); *accord Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007); *Farley v. Nationwide Mutual*, 197 F.3d 1322, 1337 (11th Cir. 1999)). Plaintiff argues that there was (1) forty-four days (approximately 1-1/2 months) between Plaintiff's meeting with Montgomery in May 2021, where she says she complained of being denied the same pay as white male employees, and her transfer on June 14, 2021; and (2) about eight weeks (approximately 2 months) between her assuming the Quality Department job under protest and her termination on August 11, 2021. (Doc. # 43 at 32). She contends this is sufficient to establish a causal connection based on timing alone. (*Id.*). The court disagrees.

A temporal connection of approximately one month may satisfy the causal connection element. *See Summers v. City of Dothan*, 444 F. App'x 346, 351 (11th Cir. 2011) ("Showing that an adverse employment action happens within one month of the protected activity satisfies the causation requirement for summary judgment purposes.") (citation omitted). But, a two month gap may not. *See  Williams v. Waste Mgmt., Inc*., 411 F. App'x 226, 229-30 (11th Cir. Jan. 25, 2011)

(holding that a two-month gap between two events is enough of a delay to preclude an inference of causation). Plaintiff's termination was right at the two-month mark after she assumed the Quality Department job under protest. This timing, alone, is insufficient to satisfy the causation element of Plaintiff's prima facie case of retaliation based on her termination.

The question becomes whether the one and one-half month interval is sufficient to raise an inference of causation as to her transfer. At least one former member of this court, the Honorable William M. Acker, Jr. questioned whether any temporal proximity alone meets the "but for" causation standard under *Nassar*. *Montgomery v. Bd. of Trustees of the Univ. of Alabama*, 2015 WL 1893471, at *4 (N.D. Ala. Apr. 27, 2015). As grounds for this position, Judge Acker referenced this explanation of the Eleventh Circuit:

> The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means "after this, because of this." Black's Law Dictionary 1186 (7th ed. 1999). It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.

*Montgomery*, 2015 WL 1893471, at *4 (quoting *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) and citing *Abbott v. Fed. Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990) ("[b]ut *post hoc, ergo propter hoc* is not a rule of legal causation")). In *Montgomery*, Judge Acker concluded that "[m]erely showing that she was terminated shortly after she complained does not meet the prima facie standard for proof [under *Nassar*] that she was terminated only because she complained." (*Id*. (citing *Nassar*, 570 U.S. at 362).

The one and one half month time gap between Plaintiff allegedly complaining about not being paid the same as the male comparator and her involuntary transfer falls in between what has been found to be sufficient to establish causation (one month in *Summers*) and what was not (two months in *Williams*). But, both of those cases were decided before *Nassar* established that a

22

Plaintiff asserting a retaliation claim must show that the retaliation was the "but-for" cause of her termination. *Summers*, 444 F. App'x at 351; *Williams*, 411 F. App'x at 229-30. This court is persuaded by Judge Acker's reasoning based on the *post hoc ergo propter hoc* fallacy. The idea that timing alone can establish but-for causation, unless much closer than the timing presented in this case, is just that – a fallacy. And, even if *Nassar* had not put into substantial question "timing alone," here, on this record,[5] the court easily concludes that a one and one-half month gap is insufficient to suggest a causal connection. Therefore, the question is whether Plaintiff has presented sufficient evidence that retaliation was the "but-for" cause of her termination to satisfy her prima facie burden on her retaliation claim. She has not. There is literally nothing else in the record suggesting retaliatory motive. Plaintiff was offered a transfer. She flatly refused it. She was then let go.

### d.      Legitimate, Non-Retaliatory Reason and Pretext

Even in a case where a plaintiff has failed to establish a prima facie case on her retaliation claim, the belts and suspenders approach this court usually takes involves (alternatively) evaluating a defendant's proffered legitimate, non-retaliatory reason for the challenged actions, and whether there is Rule 56 evidence suggesting that reason is pretextual. But, here, neither party has presented any argument on this issue. (*See* Doc. # 36 at 21; Doc. # 43 at 32-33). That is, in the one page each side devoted to Plaintiffs' retaliation claims, they each only presented argument about whether Plaintiff had presented a prima facie claim of retaliation. Therefore, the court – like the parties – concludes its analysis of Plaintiff's retaliation claims at the prima facie case stage.

---

[5] "Other cases presenting different allegations and different records may lead to different conclusions." *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, S. Ct. 1206, 1231 (2023) (Jackson, J. concurring).

C.        **Equal Pay Act Claim in Count VI**

"The EPA prohibits wage discrimination on the basis of sex and 'forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex.'" *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024) (quoting *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992) and citing 29 U.S.C. § 206(d)(1)). In *Baker*, the Eleventh Circuit recently clarified the parties' respective burdens in an EPA case:

> The analysis of an EPA claim follows a two-step framework. First, to establish a prima facie case a plaintiff must show "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, [] (1974) (quoting 29 U.S.C. § 206(d)(1)); *Brock v. Ga. Sw. Coll.*, 765 F.2d 1026, 1032 (11th Cir. 1985), *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 [] (1988). Second, if an EPA plaintiff establishes a prima facie case, "the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act:" (1) "a seniority system;" (2) "a merit system;" (3) "a system which measures earnings by quantity or quality of production;" or (4) "a differential based on any factor other than sex." *Brock*, 765 F.2d at 1036 (first citing 29 U.S.C. § 206(d)(1); and then citing *Corning*, 417 U.S. at 196[]). The application of an exception under the Act is an affirmative defense on which the employer bears the burden of proof. *Corning*, 417 U.S. at 196-97 []; *Gosa v. Bryce Hosp.*, 780 F.2d 917, 918 (11th Cir. 1986) (per curiam).

*Baker*, 94 F.4th at 1317. "The proper EPA analysis consists of two parts only; there is no third step." *Id*. at 1318 (citing *Mitchell v. Jefferson Cnty. Bd. of Educ.*, 936 F.2d 539, 547 (11th Cir. 1991)).

Here, there is a question of fact as to the first step: whether Defendant pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning*, 417 U.S. at 196. The dispute of fact relates to the central issue of whether they performed the same jobs.

Plaintiff complains that when she was transferred to the Quality Department she was not paid the same amount as Quality Engineers Rene Zimmerman and Adam Hansen. (Doc. # 34-2 at 41-46; Doc. # 35-1). Although she admits that Hansen was later promoted to a supervisory role, she testified that at some point they were all Quality Engineers, that Hansen and Zimmerman were incompetent, and that was why she was transferred to the Quality Department. Defendant has presented evidence that after her transfer to the Quality Department, Plaintiff was not performing in a Quality Engineer role. Rather, she was doing paperwork to help get ready for the AITF audit. (Doc. # 34-3 at 76-77). But these differing versions of what happened present questions of fact about whether they were performing equal work, which a trier of fact (*i.e.*, a jury) would need to resolve.

At the second step of the EPA analysis however, Defendant presented Rule 56 evidence that it paid Zimmerman and Hansen more under one of the four exceptions in the Equal Pay Act, specifically "a differential based on any factor other than sex." *Baker*, 94 F.4th at 1317. As discussed above, Defendant "made pay decisions based on employees' experience, training, and abilities." (Doc. # 35-1 at ¶ 12). "Rene Zimmerman and Adam Hansen [] – had greater experience, training, and abilities than Plaintiff." (*Id*. at ¶ 13). As noted above, Zimmerman and Hansen held four-year engineering degrees and had more extensive experience and training in the manufacturing context than Plaintiff. (Doc. # 34-2 at 41-46; Doc. # 35-1). These facts regarding the qualifications of Plaintiff, Zimmerman, and Hansen are simply not disputed in any way, shape, or form. Although Plaintiff argues she had additional experience working for Defendant's predecessors, she had not worked for those companies (or for any company) as a qualified engineer. The disparity in the qualifications and experience between Plaintiff and the alleged

comparators is stark, and not subject to any dispute. That is, Defendant has met its burden of proving it affirmative defense on undisputed facts. There are no genuine disputes of material fact for a trier of fact to decide about whether the difference in compensation was based on factors other than sex. No reasonable jury could find in Plaintiff's favor on the question of whether her sex was the reason she was paid less than Zimmerman and Hansen. *See Baker*, 94 F.4th at 1321 & n.2 ("On this record[,]" "a reasonable jury could not disagree" about Defendant's affirmative defense). Therefore, Defendant is entitled to summary judgment on Plaintiff's EPA claim.

### D.      FMLA Retaliation Claim in Count VII

Defendant has moved for summary judgment on Plaintiff's FMLA retaliation claim on the basis that Plaintiff was not an eligible employee under the FMLA because she had not worked for Defendant for twelve months. Defendant also argues that Plaintiff cannot show that Defendant's reason for her termination was pretextual. (Doc. # 36 at 23). Plaintiff argues that she should be able to rely on the fact that Defendant treated her as if she was entitled to FMLA leave and be protected against retaliation for exercising those rights. (Doc. # 43 at 35). Plaintiff has not cited any law in support of this argument. (Doc. # 43).

### 1.      Eligibility

An employee is eligible for protection under the FMLA if she has been employed for at least twelve months and worked at least 1,250 hours of service with the employer. 29 U.S.C. § 2611 (2)(A)(i)- (ii). Clearly, Plaintiff had not worked for Defendant for twelve months before her employment ended. However, "'Employer' is defined by the FMLA to include 'any successor in interest of an employer,' as well as 'any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer.'" *Henderson v. Koller Enterprises*, 2017

WL 951722, at *3 (N.D. Ala. Mar. 10, 2017) (quoting 29 U.S.C. § 2611(4)(A)(ii)). In *Henderson*, the court noted that "[t]he FMLA itself does not define the term 'successor in interest,' and the Eleventh Circuit has not yet provided guidance on the term." 2017 WL 951722, at *3 (citing *Wright v. Sandestin Investments, LLC*, 914 F. Supp. 2d 1273, 1279 (N.D. Fla. December 12, 2012)). The court has not found a case in which the Eleventh Circuit has addressed that issue. Like Judge Cornelius, the court looks to applicable labor regulations, which set forth factors for determining whether an entity is a "successor in interest." *Id.* (citing 29 C.F.R § 825.107). That regulation (29 C.F.R § 825.107) provides:

> For purposes of FMLA, in determining whether an employer is covered because it is a "successor in interest" to a covered employer, the factors ... to be considered include:
>
> 1. Substantial continuity of the same business operations;
>
> 2. Use of the same plant;
>
> 3. Continuity of the work force;
>
> 4. Similarity of jobs and working conditions;
>
> 5. Similarity of supervisory personnel;
>
> 6. Similarity in machinery, equipment, and production methods;
>
> 7. Similarity of products or services; and
>
> 8. The ability of the predecessor to provide relief.

29 C.F.R. § 825.107(a). Although the parties do not address this issue, the Rule 56 record appears to establish these elements. Defendant purchased INOAC's Bessemer plant and continued operations in much the same manner as INOAC. Indeed, Defendant operated as if Plaintiff, who was FMLA eligible with INOAC, continued to be eligible for FMLA leave. Thus, there is at least

a question of fact regarding whether Defendant is ONOAC's successor in interest under the FMLA. So, the court proceeds to evaluate this claim on its Rule 56 merits.

### 2.      Prima Facie Case

To succeed on an FMLA retaliation claim, a plaintiff may establish a prima facie case by showing that "(1) she is entitled to the claimed benefit, (2) she suffered an adverse employment action, and (3) the adverse action was 'intentional' and 'motivated' by her participation in the protected activity, establishing a causal connection." *Bentley v. Orange Cty.*, 445 F. App'x 306, 309 (11th Cir. 2011) (quoting *Strickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001)).

Even if Plaintiff is eligible for FMLA leave, showing that one is "suffering from a serious health condition [itself] is not sufficient for an employee to [take] FMLA leave." *Finch v. Morgan Stanley & Co. LLC*, 2016 WL 4248248, at *4 (S.D. Fla. Aug. 11, 2016). The FMLA's notice requirement has two criteria, "timing and content." *Finch*, 2016 WL 4248248 at *4. When giving notice of foreseeable FMLA leave, an employee must inform the employer of "the anticipated timing and duration of the leave" and where, as here, a plaintiff seeks intermittent leave to receive planned medical treatments, "the employee must consult with the employer and make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations." 29 C.F.R. 825.302(c), (e); see also *Hill v. Miami-Dade Cnty. Sch. Bd.*, 2021 WL 3173460, at *3 (S.D. Fla. July 26, 2021). "The regulations promulgated by the Department of Labor [] indicate that [e]mployees are ordinarily expected to consult with their employers *prior to the scheduling of treatment* in order to work out a treatment schedule which best suits the needs of both the employer and the employee." *Franks v. Indian Rivers Mental Health Ctr.*, 2012 WL 4736444, at *15 (N.D.

28

Ala. Sept. 30, 2012) (quoting 29 C.F.R. § 825.302(e) and citing *Kaylor v. Fannin Reg'l Hosp., Inc.*, 946 F.Supp. 988, 998 (M.D. Ga. 1996) ("The FMLA and subsequent regulations promulgated by the Department of Labor require the employee to consult with the employer when planning medical treatment.")) (internal quotes omitted) (emphasis added).

On August 9, 2021, Plaintiff requested time off from Hansen for an already-scheduled medical procedure. (Doc. # 34-1 at 176). There is no evidence that Plaintiff consulted with Defendant *before scheduling the procedure* in order to have it done at a time that would accommodate both her needs and Defendant's coverage needs. Plaintiff presented the leave request for the scheduled surgery as a *fait accompli.* Hansen responded that he did not have coverage for Plaintiff on that day. Although Plaintiff testified that she tried to see if she could move the procedure, the point is that the FMLA regulations required Plaintiff to engage in that interactive process for foreseeable FMLA leave *before* the procedure was scheduled. During the discussion with Hansen, Plaintiff stated: "Well, Adam, FMLA you have no control over, and if I have a doctor's appointment or a procedure scheduled, you know, that's just scheduled." (Doc. # 34-1 at 174-75). This statement seems to characterize Plaintiff's approach to dealing with her new employer. Furthermore, there are other key undisputed facts that matter here. Plaintiff was offered a new position, which she flatly refused. At a meeting to discuss her attendance, the Quality Department job came up and Plaintiff said she would not accept that job. (Doc. # 34-1 at 230, 271). Wilson later called Plaintiff and told her that if she refused the Quality Department job she would be terminated. (Doc. # 34-1 at 278). Plaintiff refused the position again and her employment was terminated for insubordination. (Doc. # 34-4 at 75-119; Doc. # 34-2 at 64; Doc. # 34-1 at 231-32:7; Doc. # 35-5 at ¶¶ 7-11, 14). Some might call this quitting. Indeed, Plaintiff testified that "I

was at the point where I was already thinking about leaving the manufacturing world" when all this occurred. (Doc. # 34-1 at 35). In April 2021, she had secured the building and started purchasing equipment for her catering business. (*Id*. at 53).

Plaintiff argues that her co-worker Davis's text to her, in March 2021, evidences that Defendant had a retaliatory intent some five months before in August 2021. She maintains that the text is evidence that the real reason for Plaintiff's termination was her use of FMLA leave. But, Plaintiff has not adequately explained how a text sent five months before an employment decision, by someone not involved in the decision, is probative of intent. And this is particularly so where, as here, the articulated reason for Plaintiff's termination is undisputed. Plaintiff herself testified that she made clear that she refused the position in the Quality Department that was available for her. She was informed that if she refused that position, her employment would be terminated. Yet, she continued to refuse to accept the position.

The the court concludes that Plaintiff's insistence on leave for a foreseeable procedure about which she did not confer with her employer before scheduling does not constitute protected conduct under the FMLA. But, even if it did, Plaintiff admits the conduct for which she was terminated. The non-retaliatory reason for the decision is undisputed, and a five- month-old text is insufficient to create a genuine issue of material fact about the reasons for that decision. Therefore, Defendant is also entitled to summary judgment on Plaintiff's FMLA retaliation claim.[6]

---

[6] Plaintiff's argument that Davis's text message "is arguably direct evidence" of a retaliatory intent (Doc. # 43 at 36) evinces a gross misunderstanding of what constitutes direct evidence. "Direct evidence is evidence that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc*., 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor[,] constitute direct evidence of discrimination." *Todd v. Fayette Cty. Sch. Dist*., 998 F.3d 1203, 1215 (11th Cir. 2021) (citing *Fernandez v. Trees, Inc*., 961 F.3d 1148, 1156 (11th Cir. 2020)). What would be direct evidence of retaliatory intent is a decision-maker's statement that he planned to terminate an employee because the employee's deposition was the "most damning to the

**IV.     Conclusion**

For all of the reasons discussed above, Defendant's Motion for Summary Judgment. (Doc.

# 33) is due to be granted. An order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this June 12, 2024.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE

---

company." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1182 (11th Cir. 1997). Because the text at issue was sent five months before the termination decision and had nothing to do with that decision, it simply cannot be direct evidence of retaliation. *See, e.g., Ritchie v. Industrial Steel, Inc.*, 426 F. App'x. 867, 871-72 (11th Cir. 2011) (decision maker's references to plaintiff as an "old man" were not direct evidence because they were unrelated to the termination decision).

31